Exhibit 1

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
SIMON OURIAN, M.D. aka SIAMAK OURIAN, M.D., an
individual; EPIONE MEDICAL CORPORATION, a California
corporation; EPIONE BEVERLY HILLS, INC., a California
corporation; EPIONE INTERNATIONAL, INC., a California
corporation; and Does 1-60, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
ZEIN E. OBAGI, M.D., an individual; ZEIN E. OBAGI,
M.D., INC., a California corporation; and OMP, INC.,
a Delaware corporation

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**FILED**
LOS ANGELES SUPERIOR COURT

JAN 0 5 2009

JOHN A. CLARKE, CLERK

BY ANDRE WILLIAMS, DEPUTY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* <br> LOS ANGELES SUPERIOR COURT <br> 1725 Main Street <br> 1725 Main Street <br> Santa Monica, CA 90401-3299 <br> WEST DISTRICT - SANTA MONICA | CASE NUMBER: <br> *(Número del Caso):* <br> **SC101219** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David Krol (State Bar No. 213740)          (310) 277-8011  (310) 277-1706
David Krol (State Bar No. 213740)
VALENSI ROSE, PLC
Los Angeles, CA 90067-3131

DATE:                    JOHN A. CLARKE          Clerk, by _____, Deputy
*(Fecha)*  JAN 0 5 2009                         *(Secretario)*                *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*          EXHIBIT _____/_____ PAGE /

    under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Legal Solutions Plus

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

David Krol (State Bar No. 213740)
David Krol (State Bar No. 213740)
VALENSI ROSE, PLC
2029 Century Park East, Suite 2050
Los Angeles, CA  90067-3131
TELEPHONE NO.: (310) 277-8011   FAX NO.: (310) 277-1706
ATTORNEY FOR (Name): Plaintiffs ZEIN OBAGI, MD., ZEIN E. OB

**FILED**
LOS ANGELES SUPERIOR COURT

JAN 05 2009

JOHN A. CLARKE, CLERK

BY ANDRE WILLIAMS, DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 1725 Main Street
MAILING ADDRESS: 1725 Main Street
CITY AND ZIP CODE: Santa Monica, CA  90401-3299
BRANCH NAME: WEST DISTRICT - SANTA MONICA

CASE NAME: OBAGI v. OURIAN

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: SC101219 |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: Goodman  DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[X] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive

4. Number of causes of action (specify): 6

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: January 5, 2009

David Krol (State Bar No. 213740)
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

Legal Solutions Plus

INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET       CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

SHORT TITLE: OBAGI v. OURIAN | CASE NUMBER SC101219

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES CLASS ACTION? [ ] YES LIMITED CASE? [ ] YES TIME ESTIMATED FOR TRIAL X [ ] HOURS/ [5] DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

**Applicable Reasons for Choosing Courthouse Location (See Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

ORIGINAL

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | [ ] A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | [ ] A6070 Asbestos Property Damage | 2. |
| | | [ ] A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240 Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250 Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270 Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | [X] A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., (3.) |
| | Civil Rights (08) | [ ] A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013 Fraud (no contract) | 1., 2., 3. |

EXHIBIT 1 PAGE 4

SHORT TITLE:  OBAGI v. OURIAN

CASE NUMBER

| | A<br>Civil Case Cover<br>Sheet Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>- See Step 3 Above |
|---|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional Negligence (25) | ☐ A6017 | Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050 | Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025 | Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037 | Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024 | Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109 | Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 | Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008 | Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019 | Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028 | Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002 | Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012 | Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015 | Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009 | Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031 | Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027 | Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 | Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023 | Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018 | Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032 | Quiet Title | 2. ,6. |
| | | ☐ A6060 | Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer - Commercial (31) | ☐ A6021 | Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer - Residential (32) | ☐ A6020 | Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer - Drugs (38) | ☐ A6022 | Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 | Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 | Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

EXHIBIT _____ 1 _____ PAGE _____ 5 _____

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**
**- 11 -**

| SHORT TITLE: OBAGI v. OURIAN | CASE NUMBER |
| --- | --- |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | | C<br>Applicable Reasons -<br>See Step 3 Above |
| --- | --- | --- | --- | --- |
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ | A6151   Writ - Administrative Mandamus | 2., 8. |
| | | ☐ | A6152   Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ | A6153   Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ | A6150   Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ | A6003   Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ | A6007   Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ | A6006   Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ | A6035   Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ | A6036   Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ | A6014   Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ | A6141   Sister State Judgment | 2., 9. |
| | | ☐ | A6160   Abstract of Judgment | 2., 6. |
| | | ☐ | A6107   Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ | A6140   Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ | A6114   Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ | A6112   Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ | A6033   Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ | A6030   Declaratory Relief Only | 1., 2., 8. |
| | | ☐ | A6040   Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ | A6011   Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ | A6000   Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ | A6113   Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ | A6121   Civil Harassment | 2., 3., 9. |
| | | ☐ | A6123   Workplace Harassment | 2., 3., 9. |
| | | ☐ | A6124   Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ | A6190   Election Contest | 2. |
| | | ☐ | A6110   Petition for Change of Name | 2., 7. |
| | | ☐ | A6170   Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ | A6100   Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**
**- 12 -**

LASC, rule 2.0
Page 3 of 4

| SHORT TITLE: OBAGI v. OURIAN | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☐2. ☒3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 270 North Canon Drive |

| CITY: Beverly Hills | STATE: CA | ZIP CODE: 90210 | |
|---|---|---|---|

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the LOS ANGELES SUPERIOR COURT    courthouse in the WEST                           District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: December 31, 2008

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)
David Krol (State Bar No. 213740)

---

## PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

EXHIBIT ____1____  PAGE 7

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC, rule 2.0
Page 4 of 4

- 13 -

1  M. Laurie Murphy, State Bar No. 121866
   E-Mail: mlm@vrmlaw.com
2  David Krol, State Bar No. 213740
   E-Mail: dk@vrmlaw.com
3  VALENSI ROSE
   Professional Law Corporation
4  2029 Century Park East, Suite 2050
   Los Angeles, California  90067-3031
5
   Telephone: (310) 277-8011
6  Facsimile: (310) 277-1706

7  Attorneys for Plaintiffs ZEIN E. OBAGI, M.D.,
   an individual, ZEIN E. OBAGI, M.D., INC., a
8  California corporation, and OMP, INC., a
   Delaware corporation

9

**FILED**
LOS ANGELES SUPERIOR COURT

JAN 0 5 2009

JOHN A. CLARKE, CLERK
BY ANDRE WILLIAMS, DEPUTY

INITIAL CASE MANAGEMENT REVIEW
AND CONFERENCE

APR 2 3 2009

Goodman
Dept- P  83oam

A6029
350⁰⁰
90210

10                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                  **COUNTY OF LOS ANGELES, WEST DISTRICT**

12

| | |
|---|---|
| 13  ZEIN E. OBAGI, M.D., an individual; ZEIN E. OBAGI, M.D., INC., a California corporation; and OMP, INC., a Delaware corporation, <br><br> 15                Plaintiffs, <br><br> 16       vs. <br><br> 17  SIMON OURIAN, M.D. aka SIAMAK OURIAN, M.D., an individual; EPIONE MEDICAL CORPORATION, a California corporation; EPIONE BEVERLY HILLS, INC., a California corporation; EPIONE INTERNATIONAL, INC., a California corporation; and Does 1-60, inclusive, <br><br> 21                Defendants. | CASE NO.  **SC101219** <br><br> **COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST DEFENDANTS FOR:** <br><br> 1)   **False Designation of Origin under Lanham Act (15 U.S.C. § 1125)** <br><br> 2)   **Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.)** <br><br> 3)   **Intentional Interference with Prospective Economic Advantage** <br><br> 4)   **Negligent Interference with Prospective Economic Advantage** <br><br> 5)   **False Designation of Origin under Lanham Act (15 U.S.C. § 1125)** <br><br> 6)   **Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.)** |

27
28

EXHIBIT _____ 1 _____ PAGE 8

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST DEFENDANTS

– 14 –

1       Plaintiffs ZEIN E. OBAGI, M.D., an individual, ZEIN E. OBAGI, M.D., INC., a

2   California corporation (Plaintiffs ZEIN E. OBAGI, M.D. and ZEIN E. OBAGI, M.D., INC. are

3   sometimes collectively referred to as the "Obagi Plaintiffs"), and OMP, INC., a Delaware

4   corporation, allege as follows:

5

6                                   **THE PARTIES**

7       1.      Plaintiff Zein E. Obagi, M.D. ("Dr. Obagi") is a resident of the County of Los

8   Angeles.

9       2.      Plaintiff Zein E. Obagi, M.D., Inc. is a California corporation with its principal

10   place of business in Beverly Hills, California.

11       3.      Plaintiff OMP, Inc. ("OMP") is a Delaware corporation with a place of business in

12   Long Beach, California.

13       4.      Plaintiffs are informed and believed and thereon allege that Defendant SIMON

14   OURIAN, M.D. aka SIAMAK OURIAN, M.D. ("Ourian") resides in and does business in the

15   County of Los Angeles.

16       5.      Plaintiffs are informed and believed and thereon allege that Defendant EPIONE

17   MEDICAL CORPORATION is a corporation organized under the laws of the State of California,

18   with its principal place of business in Beverly Hills, California.

19       6.      Plaintiffs are informed and believed and thereon allege that Defendant EPIONE

20   BEVERLY HILLS, INC. is a corporation organized under the laws of the State of California, with

21   its principal place of business in Beverly Hills, California.

22       7.      Plaintiffs are informed and believed and thereon allege that Defendant EPIONE

23   INTERNATIONAL, INC. is a corporation organized under the laws of the State of California,

24   with its principal place of business in Beverly Hills, California.

25       8.      Defendants EPIONE MEDICAL CORPORATION, EPIONE BEVERLY HILLS,

26   INC., and EPIONE INTERNATIONAL, INC. are collectively referred to as the "Epione

27   Defendants."                                           EXHIBIT ___1___ PAGE 9

28       9.      Plaintiffs are ignorant of the true names and capacities of Defendants Does 1

225825.2

1   through 60, inclusive, and therefore sue such Defendants by these fictitious names.  Plaintiffs will

2   amend this Complaint to allege the true names and capacities of such fictitiously-named

3   defendants when the same have been ascertained.  Upon information and belief, each of the

4   fictitiously named defendants is responsible in some manner for the damages incurred by Plaintiffs

5   as alleged herein.  Defendants, and each of them, in doing the things alleged herein, were acting as

6   the agents, representatives or employees of each of the other defendants, and were acting with the

7   knowledge and consent of each of the other Defendants.

8           10.     Plaintiffs are informed and believe and thereon allege that there existed at all times

9   relevant a unity of interest and ownership among the Epione Defendants, and between Ourian on

10   the one hand and the Epione Defendants on the other, such that the individuality and separateness

11   between them has ceased, because the Epione Defendants neglected corporate formalities, were

12   formed without necessary capital, and Ourian owned and controlled the Epione Defendants and

13   commingled funds with them.  Accordingly, the fiction of the corporation and adherence to its

14   separate existence would sanction a fraud and promote an injustice.  Therefore, the Epione

15   Defendants should not be treated separately from each other, and the Epione Defendants and

16   Ourian should not be treated individually, and Ourian should instead be adjudged as the alter ego

17   of each of the Epione Defendants.

18

19                          **FACTS COMMON TO ALL CAUSES OF ACTION**

20           11.     Dr. Obagi is a leading dermatologist who has developed and patented signature

21   skin treatments, and is an internationally renowned skin rejuvenation expert.  He has been a

22   licensed physician in California since 1981.

23           12.     Zein E. Obagi, M.D., Inc. has been in continuous business for the past 27 years.

24           13.     The Obagi Plaintiffs own and operate the Obagi Skin Health Institute, a fully

25   comprehensive skin treatment facility which is located at 270 North Cañon Drive, Beverly Hills,

26   California, and which specializes in the latest advances and most definitive technologies in skin

27   repair.                                                       EXHIBIT _____1_____ PAGE _10__

28           14.     The Obagi Plaintiffs use the personal name "Obagi" (the "Personal Name") in their

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST
DEFENDANTS
                                             – 1 6 –

1  business and in their advertising and marketing, and the Personal Name has become an asset of

2  substantial value as the distinctive identifier of the origin and quality of the goods and services

3  they offer. The Obagi Plaintiffs have expended substantial resources in advertising, developing

4  and maintaining the Personal Name, which has a high level of recognition among its skin

5  treatment patients and customers, and potential patients and customers, particularly in the greater

6  Southern California area, where their business is based.

7          15.     Through the use of the Personal Name, the Obagi Plaintiffs have developed

8  substantial and valuable goodwill throughout the Southern California region associated with the

9  Personal Name.

10         16.     OMP is the owner of the registered trademarks "Obagi," "Blue Peel," and "Obagi

11  Blue Peel" (collectively the "Registered Marks"), among others. The Obagi Blue Peel is a skin

12  treatment system which Dr. Obagi developed, and which uses trichloroacetic acid ("TCA") as the

13  active ingredient, mixed with an OMP-patented blue base.

14         17.     The Registered Marks have become assets of substantial value as the distinctive

15  identifier of the origin and quality of the goods and services which OMP offers. OMP has

16  expended substantial resources in advertising, developing and maintaining the Registered Marks,

17  which have a high level of recognition among skin treatment patients and customers, and potential

18  patients and customers, including in the greater Southern California area.

19         18.     Through the use of the Registered Marks, OMP has developed substantial and

20  valuable goodwill all over the world, including throughout the Southern California region, which

21  is associated with the Registered Marks.

22         19.     Plaintiffs are informed and believe and thereon allege that Ourian was licensed as a

23  physician in California in 1998. The current status of Dr. Ourian's medical license is unknown,

24  however, because the California Medical Board ("Medical Board") has sought to revoke or

25  suspend Ourian's license, and has alleged 33 Causes for Discipline against him. A true and

26  correct copy of the Medical Board's Second Amended and Supplemental Accusation against

27  Ourian, which is a public record accessible at http://publicdocs.medbd.ca.gov/pdl/mbc.aspx, is

28  attached as Exhibit "A."

225825.2

1    20.    Plaintiffs are informed and believe and thereon allege that Defendants own and

2  operate an entity known as "Epione," which is located at 444 North Camden Drive in Beverly

3  Hills, California.  According to the website www.epione.com, "Epione" purports to be "one of the

4  most comprehensive, state of the art laser and aesthetic surgery centers of its kind in the world."

5  The products and services that Defendants offer to their dermatologic patients and customers are

6  substantially similar to the products and services that the Obagi Plaintiffs offer their dermatologic

7  patients and customers.  In addition, Defendants' customer and patient base is similar to that of the

8  Obagi Plaintiffs.

9    21.    The Obagi Plaintiffs used to operate their business from the 444 North Camden

10  address, which is only a few blocks away from their current location on Cañon Drive in Beverly

11  Hills.

12

13  **FIRST CAUSE OF ACTION FOR FALSE DESIGNATION UNDER LANHAM ACT**

14  (By Plaintiffs Zein E. Obagi, M.D. and Zein E. Obagi, M.D., Inc. against Defendants Simon

15  Ourian, M.D. aka Siamak Ourian, M.D., Epione Medical Corporation, Epione Beverly Hills, Inc.,

16  Epione International, Inc., and Does 1-10, inclusive)

17    22.    Plaintiffs repeat and reallege Paragraphs 1-21 as though set forth herein.

18    23.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in relevant part,

19  that, "Any person who shall ... use in connection with any goods or services ... any false

20  description or representation, including words or symbols tending falsely to describe or represent

21  the same ... shall be liable to a civil action by any person ... who believes that he is or is likely to

22  be damaged by the use of any such false description or representation."

23    24.    Without the permission or consent of the Obagi Plaintiffs, Defendants use and have

24  used the Personal Name in their advertisements, business forms, trade organizations, business

25  solicitations, telephone directories, and websites.  For example:

26    a.    On Defendants' website, www.beverlyhillsmakeover.com, Defendants

27  made explicit references to Dr. Obagi, purported to quote Dr. Obagi, and falsely implied that

28  Ourian and Dr. Obagi have collaborated, all in an attempt to divert business away from the Obagi

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST
DEFENDANTS
- 18 -

1 | Plaintiffs and towards Defendants:

2 |   "According to Dr. Zein Obagi, a leading Beverly Hills dermatologist, the problem has been the lack of a scientific basis to

3 | [sic] the understanding and use of peels.

4 |   "Dr. Obagi realized the solution to [sic] problem was to get the treatment down deep enough in the skin to assist the cells, which are

5 | responsible for making elastin and collagen, which keep the skin supple and youthful.  He knew skin varies in thickness, color and

6 | consistency.  It can be dark, light, oily, combination or dry, fragile skin [sic], or tough skin [sic]. *We [sic] have needed a method* which

7 | could improve texture and tightness of all types of skin. His research produced the Obagi Blue Peel.  [Italics added.]

8 |

9 |   "Dr. Obagi estimates about 85 per cent of people with skin problems will benefit from a Blue Peel treatment.

10 |   "I quote Dr. Obagi, 'We can prevent these age changes if we go back to correct the skin cell function and make it produce elastin.

11 | 85% of people with skin problems will benefit from a Bleu [sic] Peel.'"

12 |

13 |   A true and correct copy of this article is attached as Exhibit "B."

14 |   b.  Defendants have taken out telephone listings in the name of "Obagi Skin

15 | Treatment."  A true and correct copy of a Verizon Yellow Pages listing for "Obagi Skin

16 | Treatment," taken out by Defendants, is attached as Exhibit "C."

17 |   c.  A Google search in December, 2008 for the terms "Obagi Skin Treatment"

18 | and "6506," the last 4 digits of the telephone number of Defendant Epione Medical Corporation,

19 | yielded approximately 20 online listings.

20 |   d.  Plaintiffs are informed and believe and thereon allege that Defendants never

21 | removed the parking space identifiers at 444 North Camden Drive which identify Dr. Obagi by

22 | name, and indeed sought to lease space there solely to capitalize on the fact that Dr. Obagi's

23 | facility was previously located there.

24 |   25.  Defendants began using the Personal Name to promote themselves long after the

25 | Obagi Plaintiffs did so, and long after the Personal Name had obtained a high level of recognition

26 | amongst the Obagi Plaintiffs' customers and potential customers, which distinctiveness and

27 | identification resulted solely from the Obagi Plaintiffs' efforts.

28 |   26.  Defendants were never authorized, explicitly or otherwise, to use the Personal

225825.2

EXHIBIT _____ 1 ____ PAGE 13

1   Name in their business materials, advertising, websites, or telephone or business listings.

2      27.   Because the Personal Name is widely recognized and the Obagi Plaintiffs have

3   created substantial goodwill in association with the Personal Name, given Defendants' current use

4   of the Personal Name, the Obagi Plaintiffs' patients and customers, and its prospective patients

5   and customers, and the general public, have been and are likely to continue to be confused,

6   mistaken or deceived as to the source, origin, quality or sponsorship of such products and services.

7   Moreover, the Obagi Plaintiffs are extremely concerned about the adverse effects that Defendants'

8   use of that name may have, and may have already had, on its business, given the serious

9   accusations which the California Medical Board has made and publicized against Ourian (see

10  Exhibit "A"), with whom the Obagi Plaintiffs are not affiliated in any way.

11     28.   The Obagi Plaintiffs have made repeated demands upon Defendants, and each of

12  them, to cease and desist from any further use of the Personal Name, but Defendants have refused

13  these demands and instead Defendants continue to use the Personal Name.

14     29.   Ourian, the Epione Defendants, and Does 1-10, inclusive, have engaged in, and if

15  not enjoined, will continue to engage in the commercial use of a trade name, trademark and/or

16  service mark which is deliberately and confusingly similar and/or identical to Plaintiffs' name

17  and/or mark.   Specifically, their practice of using the Personal Name constitutes a knowing use of

18  a false designation of origin, and a false description that wrongly and falsely designates their

19  services and/or products as those of the Obagi Plaintiffs.   Such false designation of origin and

20  false descriptions are likely to cause and have caused confusion, mistake and deception in the

21  public in that members of the public, to wit:  persons seeking dermatologic care and counseling in

22  the greater Southern California area who are actual patients and customers of the Obagi Plaintiffs,

23  or who are potential patients and customers of the Obagi Plaintiffs, and who have believed or are

24  likely to believe that the services provided by Ourian, the Epione Defendants, and Does 1-10,

25  inclusive, are being provided by the Obagi Plaintiffs, when in fact they are not; and/or that the

26  Obagi Plaintiffs endorse Ourian, the Epione Defendants, and Does 1-10, inclusive, in some

27  manner, when in fact they do not; and/or that Ourian, the Epione Defendants, and Does 1-10,

28  inclusive, are somehow affiliated with the Obagi Plaintiffs, when in fact they are not.

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST DEFENDANTS

1    30.    Each of Defendants' false designations of origin and false descriptions constitutes a

2  separate violation of 15 U.S.C. § 1125.

3    31.    As a direct result of Defendants' actions, the Obagi Plaintiffs have been damaged

4  in an amount according to proof.  The Obagi Plaintiffs are entitled to recover Defendants' profits,

5  the damages sustained by the Obagi Plaintiffs, as well as the costs of this action.

6    32.    Ourian, the Epione Defendants, and Does 1-10, inclusive, commenced their use of

7  their confusingly similar and/or identical trade name and/or mark with full knowledge of the

8  superior use of such by the Obagi Plaintiffs and they continued their use despite being notified of

9  the infringement.  Accordingly, their conduct, as described herein, justifies an award of treble

10  damages under 15 U.S.C. § 1117(a).

11    33.    As a result of Defendants' conduct, the Obagi Plaintiffs are also entitled to

12  attorneys' fees under 15 U.S.C. § 1117(a).

13    34.    Defendants' ongoing use of the Personal Name continues to cause substantial

14  injury to the Obagi Plaintiffs and continues to result in confusion of the marketplace and will

15  continue to result in the loss of goodwill to the Obagi Plaintiffs.  The Obagi Plaintiffs have no

16  adequate remedy at law for these injuries, and unless Ourian, the Epione Defendants, and Does 1-

17  10, inclusive, are restrained by this Court and enjoined from using the Personal Name, these

18  injuries will continue to accrue.  Therefore, the Obagi Plaintiffs are entitled to injunctive relief

19  against Ourian, the Epione Defendants, and Does 1-10, inclusive, for their use of the Personal

20  Name, as prayed herein.

21

22              **SECOND CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES –**

23                        **BUS. & PROF. CODE § 17200 et seq.**

24    (By Plaintiffs Zein E. Obagi, M.D. and Zein E. Obagi, M.D., Inc. against Defendants Simon

25  Ourian, M.D. aka Siamak Ourian, M.D., Epione Medical Corporation, Epione Beverly Hills, Inc.,

26                  Epione International, Inc., and Does 11-20, inclusive)

27    35.    Plaintiffs repeat and reallege paragraphs 1 through 34 as though fully set forth

28  herein.

225825.2

EXHIBIT _____ / _____  PAGE _15_

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST DEFENDANTS

- 21 -

36.     The use of the Personal Name by Ourian, the Epione Defendants, and Does 11-20, inclusive, constitutes an act of unfair competition in violation of Business and Professions Code § 17200 *et seq.*

37.     Defendants' conduct has caused substantial injury to the Obagi Plaintiffs, who have no adequate remedy at law for these injuries. Unless Ourian, the Epione Defendants, and Does 11-20 are restrained and enjoined by this Court from continuing their unfair competition, the injuries of the Obagi Plaintiffs will continue.

38.     The Obagi Plaintiffs are entitled to an order requiring Ourian, the Epione Defendants, and Does 11-20 to disgorge their ill-gotten gains from the above-described acts of unfair competition, an injunction prohibiting Defendants from further acts of unfair competition, and other relief the Court may fashion to redress the injuries of the Obagi Plaintiffs.

## THIRD CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(By Plaintiffs Zein E. Obagi and Zein E. Obagi, M.D., Inc. against Defendants Simon Ourian, M.D. aka Siamak Ourian, M.D., Epione Medical Corporation, Epione Beverly Hills, Inc., Epione International, Inc., and Does 21-30, inclusive)

39.     The Obagi Plaintiffs repeat the allegations in Paragraphs 1-38 as though fully set forth herein.

40.     At all relevant times from 1981 to the present, the Obagi Plaintiffs have maintained economic and business relations with the public, their patients and customers, and prospective patients and customers, and other interested parties in connection with the medical and dermatological services which they provide.

41.     At all relevant times, Ourian, the Epione Defendants, and Does 21-30, inclusive, knew of the above-described business relationships and the business being conducted by the Obagi Plaintiffs.

42.     From at least 2005 to the present, Defendants have willfully and intentionally interfered with the business relations of the Obagi Plaintiffs by, among other things:

225825.2

1          a.     registering the website www.beverlyhillsmakeover.com, in which they

2  made explicit references to Dr. Obagi, purported to quote Dr. Obagi, and falsely implied that

3  Ourian and Dr. Obagi have collaborated;

4          b.     taking out telephone listings in the name of "Obagi Skin Treatment";

5          c.     using the Personal Name in at least one sponsored advertisement on

6  Google.

7      43.    Defendants have wilfully and intentionally interfered with the business relations of

8  the Obagi Plaintiffs in an attempt to divert to Defendants the existing and potential customers and

9  patients of the Obagi Plaintiffs, and to create confusion in the marketplace about the origin of

10  Defendants' services.

11      44.    As a proximate result of Defendants' deliberate and intentional interference with the

12  economic relations of the Obagi Plaintiffs, their ongoing and prospective economic relationships

13  with their existing and potential patients and customers, and other interested parties, have been

14  severely damaged.  The Obagi Plaintiffs, are currently unaware of the total amount of damages

15  caused by the Defendants' intentional interference with their prospective economic relations, but

16  they estimate their damages to be in excess of $500,000, and will amend their pleading when said

17  amount becomes known.

18      45.    Plaintiffs are informed and believe and thereon allege that Ourian and Does 21-30,

19  inclusive, are shareholders, officers, directors, and/or managing agents of the Epione Defendants,

20  and/or have the ability to establish or change the corporate policy of the Epione Defendants.

21      46.    Plaintiffs are informed and believe and thereon allege that, in engaging in the above

22  described conduct, the Epione Defendants were aware of, and consented to, condoned, and ratified

23  the conduct of, their officers, shareholders, directors, and managing agents, including Ourian and

24  Does 21-30, inclusive.

25      47.    The above described interference with Plaintiffs' prospective economic relations by

26  Ourian, the Epione Defendants, and Does 21-30, inclusive, which is ongoing, was undertaken with

27  the deliberate intent to harm The Obagi Plaintiffs and is despicable and was and is being done with

28  willful disregard of their rights, especially in light of the fact that The Obagi Plaintiffs specifically

225825.2

1  and repeatedly requested that Defendants stop their illegal conduct, which requests were ignored.

2  Therefore, Defendants' actions justify an award of punitive damages under Civil Code § 3294.

3

4  **FOURTH CAUSE OF ACTION FOR NEGLIGENT INTERFERENCE WITH**

5  **PROSPECTIVE ECONOMIC ADVANTAGE**

6  (By Plaintiffs ZEIN E. OBAGI and ZEIN E. OBAGI, M.D., INC. against Defendants Simon

7  Ourian, M.D. aka Siamak Ourian, M.D., Epione Medical Corporation, Epione Beverly Hills, Inc.,

8  Epione International, Inc., and Does 31-40, inclusive)

9  48.  The Obagi Plaintiffs repeat the allegations in Paragraphs 1-41 as though fully set

10  forth herein.

11  49.  From at least 2005 to the present, Ourian, the Epione Defendants, and Does 31-40,

12  inclusive have negligently interfered with the business relations of the Obagi Plaintiffs by, among

13  other things:

14  a.  registering the website www.beverlyhillsmakeover.com, in which they

15  made explicit references to Dr. Obagi, purported to quote Dr. Obagi, and falsely implied that

16  Ourian and Dr. Obagi have collaborated;

17  b.  taking out telephone listings in the name of "Obagi Skin Treatment";

18  c.  using the Personal Name in at least one sponsored advertisement on

19  Google.

20  50.  Ourian, the Epione Defendants, and Does 31-40, inclusive have negligently

21  interfered with the business relations of the Obagi Plaintiffs in an attempt to divert to Defendants

22  the existing and potential customers and patients of the Obagi Plaintiffs, and to create confusion in

23  the marketplace about the origin of Defendants' services.

24  51.  As a proximate result of Defendants' interference with the economic relations of the

25  Obagi Plaintiffs, their ongoing and prospective economic relationships with their existing and

26  potential patients and customers, and other interested parties, have been severely damaged. The

27  Obagi Plaintiffs are currently unaware of the total amount of damages caused by the Defendants'

28  interference with their prospective economic relations, but they estimate their damages to be in

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST ENDANTS

– 24 –

1    excess of $500,000, and will amend their pleading when said amount becomes known.

2

3    **FIFTH CAUSE OF ACTION FOR FALSE DESIGNATION UNDER LANHAM ACT**

4    (By Plaintiff OMP, Inc. against Defendants Simon Ourian, M.D. aka Siamak Ourian, M.D.,

5    Epione Medical Corporation, Epione Beverly Hills, Inc., Epione International, Inc., and Does 41-

6    50, inclusive)

7        52.    OMP repeats and realleges Paragraphs 1-23 as though set forth herein.

8        53.    Without the permission or consent of OMP, Ourian, the Epione Defendants, and

9    Does 41-50, inclusive, use and have used the Registered Marks in their advertisements, business

10    forms, trade organizations, business solicitations, telephone directories, and websites, falsely

11    implying that they provide services associated with the Registered Marks and deliberately creating

12    confusion in the marketplace about the origin of the services which they provide.  For example:

13        a.    A Google search for the registered trademark "blue peel" yields

14    advertisements sponsored by www.epione.com, one of Defendants' webpages.  These

15    advertisements are entitled "Blue Peel," "Blue Light Peels," and "Obagi Blue Peels," respectively.

16    See Exhibit "D," pages 1-3.  By clicking on the sponsored links, the user is taken to a page on

17    www.epione.com which is entitled "Blue Light Therapy," and which describes a "therapy"

18    purportedly developed by Ourian.  See Exhibit "D," page 4.  This purported "therapy" has nothing

19    whatsoever to do with the Obagi Blue Peel, and does not even discuss the Obagi Blue Peel or any

20    OMP products.  These links are therefore highly deceptive;

21        b.    Defendants' websites, including www.beverlyhillsmakeover.com, use the

22    registered trademark "Obagi Blue Peel" as a metatag, which is an indexing tool used by Internet

23    search engines to determine which websites correspond to the search terms provided by a user, to

24    lure customers to their sites.  See Exhibit "E";

25        c.    Defendants' websites, including www.epione.com,

26    www.simonourianhome.com, www.simonourianblog.com, www.beverlyhillsmakeover.com, and

27    Ourian's accounts on www.myspace.com and www.facebook.com, all profess that Defendants

28    perform the Obagi Blue Peel, even though Ourian. the Epione Defendants, and Does 41-50,

225825.2

1 | inclusive, have not purchased any products from OMP, including the OMP-patented blue base

2 | from which the Obagi Blue Peel derives its name, in years.

3 |   54.   Ourian, the Epione Defendants, and Does 41-50, inclusive, began using the

4 | Registered Marks to promote themselves long after OMP did so, and long after the Registered

5 | Marks had obtained a high level of recognition amongst OMP's customers and potential

6 | customers, which distinctiveness and identification resulted solely from OMP's efforts.

7 |   55.   Defendants were never authorized, explicitly or otherwise, to use the Registered

8 | Marks in their business materials, advertising, websites, or telephone or business listings.

9 |   56.   Because the Registered Marks are widely recognized and have created substantial

10 | goodwill in association with the Registered Marks, given Defendants' current use of the

11 | Registered Marks, OMP's customers, and its prospective patients and customers, and the general

12 | public, have been and are likely to continue to be confused, mistaken or deceived as to the source,

13 | origin, quality or sponsorship of such products and services.  Moreover, OMP is extremely

14 | concerned about the adverse effects that Defendants' use of that name may have, and may have

15 | already had, on its business, given the serious accusations which the California Medical Board has

16 | made and publicized against Ourian (see Exhibit "A"), with whom OMP is not affiliated in any

17 | way.

18 |   57.   OMP has made repeated demands upon Defendants, and each of them, to cease and

19 | desist from any further use of the Registered Marks, but Defendants have refused these demands

20 | and instead Defendants continue to use the Registered Marks.

21 |   58.   Ourian, the Epione Defendants, and Does 41-50, inclusive, have engaged in, and if

22 | not enjoined, will continue to engage in the commercial use of a trade name, trademark and/or

23 | service mark which is deliberately and confusingly similar and/or identical to Plaintiffs' name

24 | and/or mark.  Specifically, their practice of using the Registered Marks constitutes a knowing use

25 | of a false designation of origin, and a false description that wrongly and falsely designates their

26 | services and/or products as those of OMP.  Such false designation of origin and false descriptions

27 | are likely to cause and have caused confusion, mistake and deception in the public, and

28 | specifically to persons in the greater Southern California area who are interested in benefiting

225825.2

1  from the Obagi Blue Peel procedure, and who have believed or are likely to believe that OMP

2  endorses Ourian, the Epione Defendants, and Does 41-50, inclusive, in some manner, when in fact

3  it does not; and/or that Ourian, the Epione Defendants, and Does 41-50, inclusive, are somehow

4  affiliated with OMP, when in fact they are not; and/or that Ourian, the Epione Defendants, and

5  Does 41-50, inclusive, perform the Obagi Blue Peel skin treatment procedure when, upon

6  information and belief, they do not.

7        59.    Each of Defendants' false designations of origin and false descriptions constitutes a

8  separate violation of 15 U.S.C. § 1125.

9        60.    As a direct result of Defendants' actions, OMP has been damaged in an amount

10 according to proof.  OMP is entitled to recover Defendants' profits, the damages sustained by

11 OMP, as well as the costs of this action.

12       61.    Ourian, the Epione Defendants, and Does 41-50, inclusive, commenced their use of

13 their confusingly similar and/or identical trade name and/or mark with full knowledge of the

14 superior use of such by OMP and they continued their use despite being notified of, or having

15 actual and/or constructive knowledge of, the infringement.  Accordingly, their conduct, as

16 described herein, justifies an award of treble damages under 15 U.S.C. § 1117(a).

17       62.    As a result of Defendants' conduct, OMP is also entitled to attorneys' fees under 15

18 U.S.C. § 1117(a).

19       63.    Defendants' ongoing use of the Registered Marks continues to cause substantial

20 injury to OMP and continues to result in confusion of the marketplace and will continue to result

21 in the loss of goodwill to OMP.  OMP has no adequate remedy at law for these injuries, and unless

22 Ourian, the Epione Defendants, and Does 41-50, inclusive, are restrained by this Court and

23 enjoined from using the Registered Marks, these injuries will continue to accrue.  Therefore, OMP

24 is entitled to injunctive relief against Ourian, the Epione Defendants, and Does 41-50, inclusive,

25 for their use of the Registered Marks, as prayed herein.

26 / / /

27 / / /

28 / / /

225825.2

## SIXTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES –

## BUS. & PROF. CODE § 17200 et seq.

(By Plaintiff OMP, Inc. against Defendants Simon Ourian, M.D. aka Siamak Ourian, M.D., Epione Medical Corporation, Epione Beverly Hills, Inc., Epione International, Inc., and Does 51-60, inclusive)

64.     OMP repeats and realleges paragraphs 1 through 23 and 53 through 63 as though fully set forth herein.

65.     The use of the Registered Marks by Ourian, the Epione Defendants, and Does 51-60, inclusive, constitutes an act of unfair competition in violation of Business and Professions Code § 17200 et seq.

66.     Defendants' conduct has caused substantial injury to OMP, which has no adequate remedy at law for these injuries.  Unless Ourian, the Epione Defendants, and Does 51-60, inclusive, are restrained and enjoined by this Court from continuing their unfair competition, OMP's injuries will continue.

67.     OMP is entitled to an order requiring Ourian, the Epione Defendants, and Does 51-60, inclusive, to disgorge their ill-gotten gains from the above-described acts of unfair competition, an injunction prohibiting Defendants from further acts of unfair competition, and other relief the Court may fashion to redress OMP's injuries.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.     For a temporary restraining order, a preliminary and a permanent injunction against Defendants, and each of them as set forth above;

2.     For compensatory damages and treble damages;

3.     For reasonable attorneys' fees under 15 U.S.C. § 1117(a), and/or any other statute which provides for the recovery of attorneys' fees;

4.     For an order under Business & Professions Code § 17200 requiring Defendants to disgorge their ill-gotten gains, and/or other granting other relief which the Court may fashion to

225825.2

COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST NDANTS

– 28 –

1   redress Plaintiff's injuries;

2          5.      For costs of suit incurred herein; and,

3          6.      For such other and further relief as the Court may deem proper.

4   DATED: December 31, 2008              VALENSI ROSE, PLC

5

6                                         By:   _Javil Krol_____
7                                                     David Krol
                                          Attorneys for Plaintiffs ZEIN E. OBAGI, M.D.,
8                                         an individual, ZEIN E. OBAGI, M.D., INC., a
                                          California corporation, and OMP, INC., a
9                                         Delaware corporation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                    EXHIBIT        /      PG. 23

28

225825.2                                     -15-
COMPLAINT OF PLAINTIFFS ZEIN E. OBAGI, M.D., ZEIN E. OBAGI, M.D., INC., AND OMP, INC. AGAINST
                                          DEFENDANTS

FILED
STATE OF CALIFORNIA
MEDICAL BOARD OF CALIFORNIA
SACRAMENTO *April 11*, 2008
BY *Arlene Guyum* ANALYST

1   EDMUND G. BROWN JR., Attorney General
      of the State of California
2   GLORIA L. CASTRO, State Bar No. 193304
      Deputy Attorney General
3   California Department of Justice
      300 South Spring Street, Suite 1702
4   Los Angeles, California 90013-1230
      Telephone: (213) 897-6804
5   Facsimile: (213) 897-9395

6   Attorneys for Complainant

7

8                        BEFORE THE
                MEDICAL BOARD OF CALIFORNIA
9           DEPARTMENT OF CONSUMER AFFAIRS
                   STATE OF CALIFORNIA
10

| | |
|---|---|
| 11  In the Matter of the First Amended and Supplemental Accusation Against: | Case Nos. 06-2003-152406 |
| 12  SIAMAK S. OURIAN, M.D., Also Known As Simon Ourian, M.D. | 06-2004-160369 06-2004-161296 06-2004-160515 06-2004-161339 |
| 13 | 17-2006-173029 |
| 14  436 North Bedford Drive, Suite 304 Beverly Hills, California 90210-4320 | 09-2006-172250 |
| 15  Physician and Surgeon's Certificate No. A65201, | **SECOND AMENDED AND** |
| 16                              Respondent. | **SUPPLEMENTAL ACCUSATION** |

17

18              Complainant alleges:

19                        **PARTIES**

20         1.      Barbara Johnston (Complainant) brings this First Amended and

21   Supplemental Accusation solely in her official capacity as the Executive Director of the

22   Medical Board of California (Board).  This pleading amends and supplements the First

23   Amended Accusation filed on October 11, 2007, with three additional Causes For

24   Discipline (# 30, 31, & 32) set forth beginning with Paragraph 167.

25         2.      On or about May 15, 1998, the Board issued Physician and

26   Surgeon's Certificate Number A65201 to Siamak S. Ourian, also known as Simon Ourian,

27   M.D., (hereinafter, the "Respondent" or "Dr. Ourian").  The certificate was in full force and

28   effect at all times relevant to the charges brought herein and will expire on December 31,

24

1  2009, unless renewed.

2  ### JURISDICTION

3      3.      This Accusation is brought before the Board under the authority of

4  the following laws.

5  4.Section 2227 of the Code[1] provides:

6      "(a)  A licensee whose matter has been heard by an administrative law judge

7  of the Medical Quality Hearing Panel as designated in Section 11371 of the

8  Government Code, or whose default has been entered, and who is found guilty, or

9  who has entered into a stipulation for disciplinary action with the division, may, in

10  accordance with the provisions of this chapter:

11      "(1)  Have his or her license revoked upon order of the division.

12      "(2)  Have his or her right to practice suspended for a period not to exceed

13      one year upon order of the division.

14      "(3)  Be placed on probation and be required to pay the costs of probation

15      monitoring upon order of the division.

16      "(4)  Be publicly reprimanded by the division.

17      "(5)  Have any other action taken in relation to discipline as part of an order

18      of probation, as the division or an administrative law judge may deem

19      proper.

20      "(b)  Any matter heard pursuant to subdivision (a), except for warning

21  letters, medical review or advisory conferences, professional competency

22  examinations, continuing education activities, and cost reimbursement associated

23  therewith that are agreed to with the division and successfully completed by the

24  licensee, or other matters made confidential or privileged by existing law, is deemed

25  public, and shall be made available to the public by the board pursuant to Section

26

27

28

---

1. All section references are to the Business and Professions Code unless otherwise indicated.

1     803.1."

2          5. Section 2234 of the Code provides:

3          "The Division of Medical Quality shall take action against any licensee who

4     is charged with unprofessional conduct.  In addition to other provisions of this

5     article, unprofessional conduct includes, but is not limited to, the following relevant

6     sections:

7          (a)  Violating or attempting to violate, directly or indirectly, or assisting in or

8     abetting the violation of, or conspiring to violate any provision or term of the

9     Medical Practice Act.

10         (b)  Gross negligence.

11         (c)  Repeated negligent acts.  To be repeated, there must be two or more

12    negligent acts or omissions.  An initial negligent act or omission followed by a

13    separate and distinct departure from the applicable standard of care shall constitute

14    repeated negligent acts.

15         (1)  An initial negligent diagnosis followed by an act or omission medically

16              appropriate for that negligent diagnosis of the patient shall constitute a

17              single negligent act.

18         (2)  When the standard of care requires a change in the diagnosis, act, or

19              omission that constitutes the negligent act described in paragraph (1),

20              including, but not limited to, a reevaluation of the diagnosis or a change in

21              treatment, and the licensee's conduct departs from the applicable standard of

22              care, each departure constitutes a separate and distinct breach of the standard

23              of care.

24         (d)  Incompetence.

25         (e)  The commission of any act involving dishonesty or corruption which is

26    substantially related to the qualifications, functions, or duties of a physician an surgeon."

27         6.     Section 2261 of the Code states, in pertinent part:

28         "Knowingly making or signing any certificate or other document

-32-

1  directly or indirectly related to the practice of medicine or podiatry which

2  falsely represents the existence or nonexistence of a state of facts, constitutes

3  unprofessional conduct."

4         7.     Section 2266 of the Code states:

5      "The failure of a physician and surgeon to maintain adequate and accurate

6  records relating to the provision of services to their patients constitutes

7  unprofessional conduct."

8         8.     Section 651 of the Code provides, in pertinent part:

9      "(a)  It is unlawful for any person licensed under this division or

10  under any initiative act referred to in this division to disseminate or cause to

11  be disseminated any form of public communication containing a false,

12  fraudulent misleading, or deceptive statement, claim, or image for the

13  purpose of or likely to induce, directly or indirectly, the rendering of

14  professional services or furnishing of products in connection with the

15  professional practice or business for which he or she is licensed.  A 'public

16  communication' as used in this section includes, but is not limited to,

17  communication by means of mail, television, radio, motion picture,

18  newspaper, book, list or directory of healing arts practitioners, Internet, or

19  other electronic communication.

20      "(b)  A false, fraudulent, misleading, or deceptive statement, claim,

21  or image includes a statement or claim that does any of the following:

22      "(1)  Contains a misrepresentation of fact.

23      "(2)  Is likely to mislead or deceive because of a failure to disclose material

24      facts.

25      "(3)(A)  Is intended or is likely to create false or unjustified expectations of

26  favorable results, including the use of any photograph or other image that does not

27  accurately depict the results of the procedure being advertised or that has been

28

EXHIBIT _____ 1 _____ 27

1    altered in any manner from the image of the actual subject depicted in the

2    photograph or image.

3         "(B) Use of any photograph or other image of a model without clearly

4    stating in a prominent location in easily readable type the fact that the photograph or

5    image is of a model is a violation of subdivision (a). For the purposes of this

6    paragraph, a model is anyone other than an actual patient, who has undergone the

7    procedure being advertised, of the licensee who is advertising for his or her

8    services.

9         "(C) Use of any photograph or other image of an actual patient that depicts

10   or purports to depict the results of any procedure, or presents 'before' and 'after'

11   views of a patient, without specifying in a prominent location in easily readable type

12   size what procedures were performed on that patient is a violation of subdivision

13   (a). Any 'before' and 'after' views (i) shall be comparable in presentation so that

14   the results are not distorted by favorable poses, lighting, or other features of

15   presentation, and (ii) shall contain a statement that the same 'before' and 'after'

16   results may not occur for all patients.

17        "(4) Relates to fees, other than a standard consultation fee or a range of fees

18   for specific types of services, without fully and specifically disclosing all variables

19   and other material factors.

20        "(5) Contains other representations or implications that in reasonable

21   probability will cause an ordinarily prudent person to misunderstand or be deceived.

22        "(6) Makes a claim either of professional superiority or of performing

23   services in a superior manner, unless that claim is relevant to the service being

24   performed and can be substantiated with objective scientific evidence.

25        "(7) Makes a scientific claim that cannot be substantiated by reliable, peer

26   reviewed, published scientific studies.

27        "(8) Includes any statement, endorsement, or testimonial that is likely to

28   mislead or deceive because of a failure to disclose material facts.

EXHIBIT /                    28

– 3 4 –

"(c)  Any price advertisement shall be exact, without the use of phrases, including, but not limited to, 'as low as,' 'and up,' 'lowest prices,' or words or phrases of similar import.  Any advertisement that refers to services, or costs for services, and that uses words of comparison shall be based on verifiable data substantiating the comparison.  Any person so advertising shall be prepared to provide information sufficient to establish the accuracy of that comparison.  Price advertising shall not be fraudulent, deceitful, or misleading, including statements or advertisements of bait, discount, premiums, gifts, or any statements of a similar nature.  In connection with price advertising, the price for each product or service shall be clearly identifiable.  The price advertised for products shall include charges for any related professional services, including dispensing and fitting services, unless the advertisement specifically and clearly indicates otherwise.

"(d)  Any person so licensed shall not compensate or give anything of value to a representative of the press, radio, television, or other communication medium in anticipation of, or in return for, professional publicity unless the fact of compensation is made known in that publicity.

"(e)  Any person so licensed may not use any professional card, professional announcement card, office sign, letterhead, telephone directory listing, medical list, medical directory listing, or a similar professional notice or device if it includes a statement or claim that is false, fraudulent, misleading, or deceptive within the meaning of subdivision (b).

"(f)  Any person so licensed who violated this section is guilty of a misdemeanor.  A bona fide mistake of fact shall be a defense to this subdivision, but only to this subdivision.

"(g)  Any violation of this section by a person so licensed shall constitute good cause for revocation or suspension of his or her license or other disciplinary action. . . . ."

9.     Section 17500 of the Code provides:

1   "It is unlawful for any person, firm, corporation or association, or

2   any employee thereof with intent directly or indirectly to dispose of real or

3   personal property or to perform services, professional or otherwise, or

4   anything of any nature whatsoever or to induce the public to enter into any

5   obligation relating thereto, to make or disseminate or cause to be made or

6   disseminated before the public in this state, or to make or disseminate or

7   cause to be made or disseminated from this state before the public in any

8   state, in any newspaper or other publication, or any advertising device, or by

9   public outcry or proclamation, or in any other manner or means whatever,

10  including over the Internet, any statement concerning that real or personal

11  property or those services, professional or otherwise, or concerning any

12  circumstance or matter of fact connected with the proposed performance or

13  disposition thereof, which is untrue or misleading, and which is known, or

14  which by the exercise of reasonable care should be known, to be untrue or

15  misleading, or for any * * * person, firm, or corporation to so make or

16  disseminate or cause to be so made or disseminated any such statement as

17  part of a plan or scheme with the intent not to sell that personal property or

18  those services, professional or otherwise, so advertised at the price stated

19  therein, or as so advertised.  Any violation of the provisions of this section is

20  a misdemeanor punishable by imprisonment in the county jail not exceeding

21  six months, or by a fine not exceeding two thousand five hundred dollars

22  ($2,500), or by both that imprisonment and fine."

23          10.     Section 2271 of the Code provides:

24          "Any advertising in violation of section 17500, relating to false or

25  misleading advertising, constitutes unprofessional conduct."

26                          **MEDICAL TERMS**

27          11.     Hyperemia -- The presence of an increased amount of blood flow in

28  a part or an organ.

1        12.     Dysplastic Nevi -- Abnormal tissue development in a circumscribed

2  malformation of the skin

3        13.     Actinic Keratotic Lesions -- A premalignant warty lesion occurring

4  on the sun-exposed skin of the face and hands in aged light-skinned persons.

5  Hyperkeratosis may form a cutaneous horn, and squamous cell carcinoma of low-grade

6  malignancy may develop in a small proportion of untreated patients.

7        14.     Lentigos – A benign, acquired brown macule resembling a freckle

8  except that the border is usually regular and microscopic elongation of rete ridges is present

9        15.     Syringoma – A benign, often multiple, sometimes eruptive neoplasm

10  of the sweat gland ducts composed of very small round cysts.

11                    **FIRST CAUSE FOR DISCIPLINE**

12                         (Patient S. O.[2])

13                      (Gross Negligence)

14        16.     On or about June 9, 2003, S.O. sought treatment in the form of a

15  Coolaser™ cosmetic laser peel from respondent to address her complaints of wrinkles and

16  skin discolorations. In the consent form provided to S.O. dated May 19, 2003, S.O.

17  consented to respondent's use of the Coolaser™ to treat her complaints, and agreed to pay

18  respondent the sum of $3,700.00 for his services. S.O. further consented to the use of a

19  dermal filler (Radiance) to pump up creased, furrowed, or sunken facial skin. Although the

20  consent form addressed "unforseen conditions" that may arise during the course of a

21  treatment which, in the judgment of the physician, required additional treatment or a

22  different procedure, none of the consents signed by S.O. specifically addressed the use of

23  an Erbium YAG laser, Diolight 532 laser, or scalpel surgery. There is no documentation in

24  the medical record that respondent discussed with S.O. that he may employ alternative

25

26  ————————————

27    2. In this Accusation, patients will be referred to by their initials. The full names of the
patients will be disclosed to respondent when discovery is provided pursuant to Government

28  Code section 11507.6.

1   treatment methods other than the Coolaser™ technique that S.O. thought she would

2   receive.

3              17.      On June 9, 2003, respondent's preoperative diagnosis for S.O.

4   included facial, neck, arm, and trunk dysplastic nevi, actinic keratotic lesions, solar

5   lentigos, and wrinkles.  There is no documentation in the medical record that a physical, or

6   any type of diagnostic examination was performed in support of respondent's diagnoses.

7   The procedure note for June 9, 2003, indicates that respondent performed laser ablation of

8   the pigmented lesions of her face and neck, followed by Erbium YAG resurfacing of her

9   face and neck.  The unsigned operative report also indicates that the Diolight 532 was

10  utilized, scalpel surgery was performed, and "multiple areas on the face and neck were

11  ablated."  Respondent's operative note indicates that he treated S.O.'s face with the Erbium

12  laser to 40 microns.  There is no indication in the medical record that specimens from the

13  scalpel surgery were submitted for pathology.  S.O. states that she never sought treatment

14  from respondent for destruction of pre-malignant lesions, and that she did not have any

15  lesions on her face or neck when she sought treatment from respondent.

16             18.      After the first treatment on June 9, 2003, S.O. suffered no ill effects,

17  and she returned to respondent's office on July 14, 2003 for further treatment.

18  Respondent's unsigned procedure note for this visit and treatment is identical to his

19  procedure note dated June 9, 2003, which indicates that the procedure performed on July

20  14, 2003, was performed in exactly the same manner as the procedure on June 9, 2003.

21             19.      After the second procedure, S.O. experienced pain, itching, burning

22  and stinging to her anterior neck, and on July 17, 2003, sought treatment from her

23  dermatologist who referred her to the Grossman Medical Center for treatment of first to

24  second degree burns to her neck.  S.O. presented at the Grossman Medical Center for

25  treatment on July 18, 2003, four days after her laser treatment with respondent.  The

26  medical record from Grossman Medical Center describes a partial thickness burn to the

27  anterior neck, which was swollen and healing, dry, and scabbing.

28

EXHIBIT _____ /_____ ___ 3.1

20.     Respondent's treatment of S.O. as set forth above includes the following acts and/or omissions which constitute extreme departures from the standard of practice.

A.     There is no documentation in the medical record that respondent performed an adequate physical examination of respondent prior to performing laser treatment.

B.     Respondent diagnosed S.O. with dysplastic nevi. The treatment of dysplastic nevi with laser is contrary to the standard of practice because dysplastic nevi can, in fact, be a melanoma or eventually develop into a melanoma, and laser destruction of these lesions is an extreme departure from the standard of practice.

C.     Respondent 's operative report references scalpel surgery, actinic keratosis, and dysplastic nevi. If scalpel surgery had been performed, then specimens would have been obtained for pathology, however, no pathology specimens were submitted by respondent.

D.     S.O. consented to the use of the Coolaser™ and the consent she signed discussed Coolaser™ treatment. However, respondent used a combination laser program which included an Erbium YAG laser and a Diolight 532 laser. Neither of these modalities of treatment are consented for in the forms signed by S.O., and there is no documentation in the medical record that respondent discussed these specific treatment modalities with S.O.

E.     There is no documentation in the consent forms signed by S.O. that the laser would be utilized for the treatment of lesions or that scalpel surgery would be utilized. There is no documentation in the medical record that laser treatment for lesions or scalpel surgery were discussed with S.O. prior to or after treatment.

F.     There is no documentation in the medical record of a preoperative consultation with S.O. for either the June 9, 2003, treatment or the July 14, 2003, treatment. The unsigned operative reports are clearly duplicative and do not accurately represent what respondent was treating on those dates.

1        G.    The medical record does not document what laser settings

2    respondent used in the treatment of S.O.  However, the extent of the inflammation

3    and crusting is consistent with a deeper Erbium laser peel.  There is no

4    documentation in the consent form signed by S.O. that she consented to any deeper

5    type of laser treatment.

6        H.    It is well documented that the neck heals very poorly and/or

7    erratically.  Respondent 's treatment of S.O.'s neck with the Erbium laser at the

8    settings that the respondent must have utilized is an extreme departure from the

9    standard of practice.

10        21.    Respondent's acts and/or omissions as set forth in paragraphs 16

11    through 20, inclusive, above whether proven individually, jointly, or in any combination

12    thereof, constitute gross negligence pursuant to section 2234 (b) of the Code.  Therefore,

13    cause for discipline exists.

14                **SECOND CAUSE FOR DISCIPLINE**

15                        **(Patient S.O.)**

16                   **(Repeated Negligent Acts)**

17        22.    Respondent is subject to disciplinary action under section 2234 (c) of

18    the Code in that respondent's care and treatment of patient S.O. constituted repeated

19    negligent acts.  The circumstances are as follows:

20        23.    The allegations of the First Cause for Discipline are incorporated

21    herein by reference as if fully set forth.

22        24.    Respondent's acts and/or omissions as set forth in paragraph 23

23    above,  whether proven jointly, or in any combination thereof, constitute repeated negligent

24    acts pursuant to section 2234 (c) of the Code.  Therefore, cause for discipline exists.

25    //

26    //

27    //

28    //

                                                                                           /           33

### THIRD CAUSE FOR DISCIPLINE

**(Patient S.O.)**

**(Inadequate Records)**

25.     Respondent is subject to disciplinary action under section 2266 of the Code in that respondent failed to maintain adequate records of his care and treatment of patient S.O. The circumstances are as follows:

26.     The allegations of the First Cause for Discipline are incorporated herein by reference as if fully set forth.

27.     Respondent's acts and/or omissions as set forth in paragraph 26 above constitute the maintenance of inadequate records within the meaning of section 2266 of the Code.  Therefore, cause for discipline exists.

### FOURTH CAUSE FOR DISCIPLINE

**(Patient S.O.)**

**(Incompetence)**

28.     Respondent is subject to disciplinary action under section 2234(d) of the Code in that respondent's care and treatment of S.O. demonstrates incompetence (lack of knowledge or ability).  The circumstances are as follows:

29.     The allegations of the First Cause for Discipline are incorporated herein by reference as if fully set forth.

30.     Respondent's acts and/or omissions as set forth in paragraph 29 above constitute incompetence within the meaning of section 2234(d) of the Code. Therefore, cause for discipline exists.

### FIFTH CAUSE FOR DISCIPLINE

**(Patient S.O.)**

**(Dishonest and Corrupt Acts and/or Knowingly Making a False Document)**

31.     Respondent is subject to disciplinary action under sections 2234(e) and 2261 of the Code in that respondent's acts and/or omissions in billing her insurance

1  company for the care and treatment provided to S.O. constitute dishonest and corrupt acts

2  and/or knowingly making or signing a false document as follows:

3        32.    The allegations of the First Cause for Discipline are incorporated

4  herein as if fully set forth.

5        33.    On or about June of 2003, S.O. paid respondent the sum total of

6  $3,700.00 for Coolaser™ treatment. None of the treatments that S.O. received from

7  respondent were to be covered by her insurance carrier. S.O. did not have lesions on her

8  face or neck when she presented for treatment on June 9, 2003, nor did respondent advise

9  S.O. that he would be removing lesions from her face or neck. After receiving an

10  Explanation of Benefits (EOB) dated September 11, 2003, from her insurance carrier, S.O.

11  discovered that respondent had billed her insurance company for the alleged destruction of

12  pre-malignant lesions during the June 9, 2003 treatment. Respondent billed the insurance

13  carrier $9, 363.33 for this treatment and procedure.

14        34.    On or about September 2003, S.O. received another EOB statement

15  from her insurance carrier dated September 12, 2003, which indicated that respondent

16  billed S.O.'s insurance carrier $2, 350.00 for the "destruction of benign malignant lesions"

17  and "destruction of 2-14 lesions."

18        35.    Respondent is subject to discipline pursuant to sections 2234 (e) and

19  2261 of the Code in that he engaged in dishonest and corrupt acts which are substantially

20  related to the qualifications, functions or duties of a physician, and/or knowingly made,

21  and/or signed a false document as follows:

22        A.    Respondent billed S.O.'s insurance carrier for services and treatment

23        that he did not perform on S.O. Respondent billed for the destruction of pre-

24        malignant lesions when S.O. did not present for treatment of lesions on her face or

25        neck.

26        B.    Respondent did not have the consent of S.O. to perform a procedure

27        on June 9, 2003, or July 14, 2003, for the destruction of pre-malignant lesions or

28

1    lesions on her face or neck, and respondent did not have the permission of S.O. to

2    bill her insurance carrier for this procedure.

3         C.      Respondent documented in the medical record identical procedure

4    notes dated June 9, 2003, and July 14, 2003, that scalpel surgery was performed on

5    S.O. However, if scalpel surgery was actually performed, pathology specimens

6    should have been submitted and none were.

7         D.      Respondent double-billed S.O. and her insurance carrier for

8    treatment and services that he performed on June 9, 2003 and July 14, 2003.

9         36.     Respondent's acts and/or omissions as set forth in paragraphs 32

10   through 35, inclusive, whether proven individually, or in any combination thereof,

11   constitute a violation of sections 2234(e) and/or section 2261 of the Code. Therefore, cause

12   for discipline exists.

## SIXTH CAUSE FOR DISCIPLINE

### (Patient C.H.)

### (Gross Negligence)

16        37.     On or about December 13, 2003, patient C.H. consulted with

17   respondent regarding a dermal filler called Radiance to treat depressions in her face caused

18   by acne scarring. During the consultation, respondent assured C.H. that the dermal filler

19   was safe and that if something went wrong, and the area did not turn out smooth, he could

20   fix it. On that date, after a brief look at C.H.'s face, respondent told her she would need up

21   to 6cc's of Radiance.

22        38.     On or about December 16, 2003, C.H. returned to respondent' office

23   and received her first injections of Radiance. Respondent injected 4 ccs of Radiance into

24   her face. When respondent needed to refill the syringe, he inserted the soiled needle back

25   into the vial to draw more Radiance into the syringe.

26        39.     On or about January 20, 2004, C.H. returned to respondent for a

27   follow-up visit. She complained that her right cheek and left jaw, where the Radiance had

28   been injected, were bumpy.

1       40.     On March 29, 2004, C.H. still complained to respondent of

2   bumpiness in her face.   Respondent recommended cortisone injections to correct the

3   deformity, and these treatments were administered over the next several months.  There is

4   no documentation in the medical record that respondent injected C.H. with cortisone. When

5   respondent was interviewed by the Medical Board investigator on March 17, 2005, he did

6   not recall injecting cortisone into C.H.'s face.

7       41.     There are no medical records for any additional treatments or visits

8   for C.H. other than her initial consultation, and first treatment in December of 2003.

9   However, there are signed consent forms for additional treatments, and there are  Release of

10   Claims forms dated March 29, 2004, and May 17, 2004.   There is one progress note for

11   December 15, 2003, indicating that 4 cc's of Radiance was used in treatment, and that C.H.

12   may need additional injections.  There is no documentation in the medical record for C.H.

13   that a physical examination was performed.

14       42.     Respondent's acts and/or omissions in the care and treatment of

15   patient C.H. constitute extreme departures from the standard of practice as follows:

16       A.     There is no documentation in the medical record of any office visits

17   after December 15, 2003.

18       B.     There is no documentation  in the medical record of any interaction

19   or discussion between C.H. and respondent  regarding C.H.'s treatment and the

20   procedure to be performed.

21       C.     There is no clear good faith examination of C.H. documented in the

22   medical records.

23       D.     There is no documentation in the medical record of the specific areas

24   of C.H.'s face that were injected with dermal filler.

25       E.     Radiance is provided in syringes and not in vials.  Respondent's act of

26   injecting C.H. with Radiance he allegedly withdrew from a vial for multi-purposes is an

27   extreme departure from the standard of practice.

28

− 44 −

1    F.    There is no documentation in the medical record that respondent injected

2    cortisone into C.H.'s face.

3         43.    The allegations set forth in paragraphs 37 through 42, inclusive, above,

4    whether proven individually, jointly, or in any combination thereof, constitute gross negligence

5    pursuant to section 2234 (b) of the Code. Therefore, cause for discipline exists.

6                              **SEVENTH CAUSE FOR DISCIPLINE**

7                                          **(Patient C.H.)**

8                                    **(Repeated Negligent Acts)**

9         44.    Respondent's acts and/or omissions in the care and treatment of C.H.

10   constitute repeated negligent acts as follows:

11        45.    The allegations of the Sixth Cause for Discipline are incorporated herein by

12   reference as if fully set forth.

13        46.    Respondent did not take an adequate previous history from C.H. of

14   treatments she may have received in the same affected areas.  This act and/or omission constitutes

15   a simple departure from the standard of practice.

16        47.    Respondent's acts and/or omissions as set forth in paragraphs 44 and 45

17   above, whether proven jointly, or in any combination thereof, constitute repeated negligent acts

18   pursuant to section 2234(c) of the Code.  Therefore, cause for discipline exists.

19                              **EIGHTH CAUSE FOR DISCIPLINE**

20                                         **(Patient C.H.)**

21                                        **(Incompetence)**

22        48.    Respondent's acts and/or omissions in the care and treatment of C.H.

23   constitute incompetence as follows:

24        49.    The allegations of the Sixth and Seventh Causes for Discipline are

25   incorporated herein as if fully set forth.

26        50.    Respondent's acts and/or omissions as set forth in paragraph 49 above,

27   constitute incompetence pursuant to section 2234(d) of the Code.  Therefore, cause for discipline

28   exists.

## NINTH CAUSE FOR DISCIPLINE

### (Patient C.H.)

### (Inadequate Record Keeping)

51.     Respondent is subject to disciplinary action under section 2266 of the Code in that respondent failed to maintain adequate records of his care and treatment of patient C.H. as follows:

52.     The allegations of the Sixth and Seventh Causes for Discipline are incorporated herein by reference as if fully set forth.

53.     Respondent's acts and/or omissions as set forth in paragraph 52 above, constitute the maintenance of inadequate records within the meaning of Code section 2266. Therefore, cause for discipline exists.

## TENTH CAUSE FOR DISCIPLINE

### (Patient S.B.)

### (Gross Negligence)

54.     On or about July 26, 2004, patient S.B. consulted with respondent's assistant, Rana, about the Coolaser™ treatment because she was unhappy with the brown spots on her face and neck which were the result of years of sun damage.   S.B. sought treatment from respondent because she saw an infomercial promoting his practice, and in that infomercial he claimed that he had invented the "Coolaser"™ procedure, and that it was a very safe method for treating all types of skin-related complaints.

55.     At the initial consultation, respondent's assistant told S.B. that the laser treatment would be mildly uncomfortable, and that afterward it would feel like she had a sunburn on her face.  The assistant minimized the risk of the procedure and told S.B. the healing time would be quite short, just a few days.  The assistant also told S.B. that the total cost for three laser treatment would be $4,500.  S.B. made a $1,000.00 deposit on July 26, 2005, and made an appointment for the first treatment.  S.B. also signed consent forms on July 25, 2004 for the Coolaser™ treatment.

1      39

17

— 4 6 —

1       56.     The first laser treatment was performed on Friday, August 20, 2004.

2  Following the treatment, S.B.'s face was very red and painful. S.B. became concerned and

3  telephoned respondent the following day, August 21, 2004. Respondent advised S.B. that her

4  condition was normal, advised her to continue applying cool compresses, and told her to follow

5  the instruction booklet she was given.

6       57.     On Friday, September 17, 2004, S.B. returned to respondent for her second

7  treatment. During the second treatment, the pain was very intense. When S.B. awoke the next

8  day, she had a hard dry crust all over her face and was bleeding from her cheek and chin. S.B.

9  could not open her mouth to eat or speak. S.B. was upset and telephoned respondent. Respondent

10  appeared annoyed, and told her to read the instruction booklet. By Tuesday, September 21, 2004,

11  S.B.'s face began to peel and the skin underneath was bright red. S.B. could not return to work

12  for one full week following the second treatment. After the second treatment, S.B. attempted to

13  obtain a refund of the money paid to respondent. S.B. was advised by respondent's office staff

14  that the $4,500.00 she was charged covered "up to three" treatments, and that she still owed the

15  full amount. She was advised that the total amount is collected even if there is only one procedure

16  performed.

17       58.     The medical record does not document the treatment that respondent

18  provided to S.B. The medical record does not document respondent's laser settings in the

19  treatment of S.B. The medical record does not document that respondent performed a good faith

20  examination of patient S.B. The medical record does not document the postoperative care

21  provided to S.B. When respondent was asked during an interview with the Medical Board

22  Investigator on March 17, 2005, why he did not make notes in the medical record as to the care

23  and treatment provided to this patient, respondent responded that he does not make notes because

24  notes are "sometimes used against him, when a patient is unhappy with the result, and the issue

25  goes to court."

26       59.     Respondent's acts and/or omissions in the care and treatment of patient

27  S.B. constitute extreme departures from the standard of practice as follows:

28

EXHIBIT _____ 1 _____ PAGE 40

1    A.    Respondent did not document and/or perform a good faith examination of

2    S.B.

3    B.    Respondent did not document the nature of the treatment performed or the

4    laser settings used on S.B.

5    C.    Respondent did not document any of S.B.'s post operative complaints or

6    concerns in the medical record.

7    D.    S.B. was misled by the marketing materials utilized by respondent and by

8    the recommendations made by his assistant, Rana, as to the potential for problems

9    associated with the laser procedure respondent performed.  The amount of crusting and

10   oozing experienced and documented by S.B. at 76 hours post-laser surgery is far beyond

11   the expectations a patient would have for a procedure advertised as "no down time."

12   60.    The allegations set forth in paragraphs 54 through 59, inclusive, above,

13   whether proven individually, jointly, or in any combination thereof, constitute gross negligence

14   pursuant to section 2234 (b) of the Code.  Therefore, cause for discipline exists.

## ELEVENTH CAUSE FOR DISCIPLINE

### (Patient S.B.)

### (Repeated Negligent Acts)

18   61.    Respondent's acts and/or omissions in the care and treatment of S.B.

19   constitute repeated negligent acts as follows:

20   62.    The allegations of the Tenth Cause for Discipline are incorporated herein as

21   if fully set forth.

22   63.    At the consultation, respondent did not adequately advise S.B. of the

23   potential problems that could occur with respect to the treatment he performed.  This act and/or

24   omission constitutes a simple departure from the standard of practice.

25   64.    Respondent's acts and/or omissions as set forth in paragraphs 62 through

26   63, inclusive, above, whether proven jointly, or in any combination thereof constitute repeated

27   negligent acts pursuant to section 2234(c) of the Code.  Therefore, cause for discipline exists.

28   //

## TWELFTH CAUSE FOR DISCIPLINE

### (Patient S.B.)

### (Incompetence)

65.     Respondent's acts and/or omissions in the care and treatment of S.B. constitute incompetence as follows:

66.     The allegations of the Tenth and Eleventh Causes for Discipline are incorporated herein as if fully set forth.

67.     Respondent's acts and/or omissions as set forth in paragraph 66 constitute incompetence pursuant to section 2234(d) of the Code. Therefore, cause for discipline exist.

## THIRTEENTH CAUSE FOR DISCIPLINE

### (Patient S.B.)

### (Inadequate Record Keeping)

68.     Respondent is subject to disciplinary action under section 2266 of the Code in that respondent failed to maintain adequate records of his care and treatment of patient S.B. as follows:

69.     The allegations of the Tenth and Eleventh Causes for Discipline are incorporated herein by reference as if fully set forth.

70.     Respondent's acts and/or omissions as set forth in paragraph 69 above, constitute the maintenance of inadequate records within the meaning of Code section 2266. Therefore, cause for discipline exists.

## FOURTEENTH CAUSE FOR DISCIPLINE

### (Patient S.B.)

### (False or Misleading Advertising and/or Dishonest and Corrupt Acts)

71.     Respondent is subject to disciplinary action under sections 2271, 17500, and 651 of the Code for false and misleading advertising and/or dishonest and corrupt acts under section 2234(e) of the Code as follows:

72.     The allegations of the Tenth and Eleventh Causes for Discipline are incorporated herein as if fully set forth:

73.     At the initial consultation on July 26, 2004, respondent's assistant, Rana advised S.B. that the laser treatment would be mildly uncomfortable, and that afterward it would feel like a sunburn on her face.   This assistant also told S.B. that the healing time would be quite short.  S.B. was also given an information sheet on the Coolaser™ which stated that treatment required "minimal or no downtime."  S.B. relied on the assistant's representations to her, and on the Coolaser™ information sheet provided to her in making her decision to have the treatment performed by respondent.  After the second laser treatment, S.B. was in intense pain, her face was crusted and bleeding, and she missed a full week of work.

74.     At the initial consultation on July 26, 2004, respondent's assistant, Rana advised S.B. that the $4,500.00 she deposited would cover the cost of three laser treatments.  When S.B. attempted to have a portion of the $4,500.00 returned to her after the second treatment, she was advised by respondent's staff that she owed the full amount because the $4,500.00 is charged even if only one laser procedure is performed.

75.     Respondent's acts and/or omissions set forth in paragraphs 71, 72, and 73 constitute false and/or misleading advertising in violation of sections 2271, 17500, and 651 of the Code, and/or dishonest and corrupt acts that are substantially related to the duties, functions, and qualifications of a physician in violation of section 2234(e) of the Code.  Therefore, cause for discipline exists.

## FIFTEENTH CAUSE FOR DISCIPLINE

### (Patient S.J.)

### (Gross Negligence)

76.     On or about October 27, 2003, patient S.J. sought treatment for small bumps under her eyes which she advised respondent's office staff was a condition known as "syringoma."  At the consultation on October 27, 2003, respondent's assistant told S.J. that respondent could treat the bumps under her eyes.  When S.J. asked to actually see the doctor, the assistant said, "I can tell you he can do it because he has treated this before."  S.J. insisted on seeing respondent, and respondent eventually looked at her face.  Respondent gave a cursory look

1   at S.J.'s face and told her he could take care of the "bumps."   S.J. agreed to pay respondent

2   $3,700.00 for a total of three laser treatments.

3        77.   Respondent performed the first Coolaser™ treatment on November 10,

4   2003. After this first procedure was performed, S.J. noticed that the small bumps on her face

5   were spreading into the center of her face.

6        78.   On January 9, 2004, S.J. returned to respondent's office for her second

7   treatment. At that time, respondent told S.J. that it would take all three treatments for the

8   syringoma to disappear. Given this explanation, S.J. agreed to the second treatment. After the

9   second treatment, S.J. noticed that the "syringoma" had spread to other portions of her face. S.J.

10   called respondent's office to complain about this problem, but she received no response from

11   respondent or his staff.

12        79.   On February 6, 2004, S.J. returned  to respondent's office for her third

13   treatment. When she asked respondent why he had not responded to her messages, he did not

14   offer any explanation. After the third treatment, the small bumps on her face continued to spread

15   down her face and across her forehead above her nose. S.J. made several calls to respondent'

16   office to complain again, and left messages requesting her medical records, but never received a

17   response.

18        80.   In addition to the laser treatments for the treatment of the syringoma,

19   respondent also performed three laser treatments on S.J.' hands for brown spots. The treatment of

20   S.J.'s hands is not documented anywhere in respondent's medical records.

21        81.   S.J. was given a cream allegedly developed by respondent to help lighten

22   her skin. The cream's packaging did not list its ingredients. There is no documentation in S.J.'s

23   medical records that respondent gave S.J. this cream. When respondent was interviewed by the

24   Medical Board Investigator and Medical Board Consultant on March 17, 2005, about his care and

25   treatment of S.J., he stated that he did indeed give S.J. a cream that he developed. According to

26   respondent, the cream contains Retin A, two bleaching agents, hydrocortisone, and a strong

27   moisturizer.

28

1    82.    During the March 17, 2005 interview, respondent stated that he doubted

2    that the bumps on S.J.'s face were syringoma.  Respondent stated that a biopsy would need to be

3    performed in order to make a diagnosis as to what the bumps were, which he did not do.

4    Respondent further admitted that he did not perform a biopsy since the treatment for whatever the

5    condition on her face was would be the same, and that is why he recommended a course of three

6    laser treatments.

7    83.    During the interview on March 17, 2005, respondent stated that he does not

8    note the laser settings in his medical records because the Coolaser™ settings are always the same,

9    did not change per patient, therefore, there was no reason to record them.

10    84.    Respondent's acts and/or omissions in the care and treatment of patient

11    S.J. constitute extreme departures from the standard of practice as follows:

12    A.    The medical record does not indicate a clinical diagnosis so it is impossible

13    to know what condition respondent was treating on S.J.'s face.  The medical record only

14    indicates that S.J. told respondent that the bumps on her face were "syringoma."

15    B.    S.J. presented with clinical lesions on her face which is a medical condition

16    that respondent failed to address, and this failure put S.J. at risk.

17    C.    Respondent did not perform a biopsy of the bumps on S.J.'s face.

18    D.    Respondent did not perform a good faith examination of S.J. prior to

19    treating her condition.

20    E.    Respondent did not document the nature of the treatment performed or the

21    laser settings used when treating S.J.

22    F.    Respondent did not document any of S.J.'s post-procedure complaints in

23    the medical record.

24    G.    Respondent's treatment of syringoma with non-invasive lasering is an

25    extreme departure from the standard of practice since the treatment of syringoma typically

26    requires a level of invasion utilizing electrocautery or destructive laser modality of each

27    individual lesion.

28

45

1    H.    Respondent failed to consider or discuss alternative treatment options with

2    S.J.

3    I.    Because of the rapid proliferation of the bumps and/or lesions after S.J.'s

4    first treatment, respondent should have known that he was not treating syringoma since

5    rapid proliferation of syringoma would be atypical.  Respondent admitted that he had no

6    clinical data regarding the condition he was treating on S.J.'s face, which constitutes an

7    extreme departure from the standard of practice.

8    J.    There is no documentation in the medical record that respondent treated

9    S.J.'s hands for hyper-pigmentation.

10   K.    There is no documentation in the medical record, other than a receipt that

11   indicates  S.J. paid for a cream, as to what type of cream respondent provided to S.J., and

12   the medical indication for that cream.

13   L.    There is no documentation in the medical record that respondent considered

14   and/or discussed less risky modalities to treat the hyper-pigmentation on S.J.'s hands.

15   85.    The allegations set forth in paragraphs 76 through 84, above, whether

16   proven individually, jointly, or in any combination thereof, constitute gross negligence pursuant to

17   section 2234 (b) of the Code. Therefore, cause for discipline exists.

18   **SIXTEENTH CAUSE FOR DISCIPLINE**

19   **(Patient S.J.)**

20   **(Repeated Negligent Acts)**

21   86.    Respondent's acts and/or omissions in the care and treatment of S.J.

22   constitute repeated negligent acts as follows:

23   87.    The allegations of the Fifteenth Cause for Discipline are incorporated

24   herein as if fully set forth.

25   88.    The consents that S.J. signed on October 27, 2003, are not specific for the

26   condition for which S.J. presented and/or the treatment to be performed.

27

28                                                   _1_        _46_

89.     Respondent's acts and/or omissions as set forth in paragraphs 87 and 88 above, whether proven jointly, or in any combination thereof, constitute repeated negligent acts pursuant to section 2234(c) of the Code.  Therefore, cause for discipline exists.

## SEVENTEENTH CAUSE FOR DISCIPLINE

### (Patient S.J.)

### (Incompetence)

90.     Respondent's acts and/or omissions in the care and treatment of S.J. constitute incompetence as follows:

91.     The allegations of the Fifteenth and Sixteenth Causes for Discipline are incorporated herein as if fully set forth.

92.     Respondent's acts and/or omissions as set forth in paragraph 91 constitute incompetence pursuant to section 2234(d) of the Code.  Therefore, cause for discipline exists.

## EIGHTEENTH CAUSE FOR DISCIPLINE

### (Patient S.J.)

### (Inadequate Records)

93.     Respondent is subject to disciplinary action under section 2266 of the Code in that respondent failed to maintain adequate records of his care and treatment of patient S.J.  The circumstances are as follows:

94.     The allegations of the Fifteenth and Sixteenth Causes for Discipline are incorporated herein by reference as if fully set forth.

95.     Respondent's acts and/or omissions as set forth in paragraph 94 constitute the maintenance of inadequate records within the meaning of Code section 2266.  Therefore, cause for discipline exists.

## NINETEENTH CAUSE FOR DISCIPLINE

### (Patient P.A.)

### (Repeated Negligent Acts)

96.     On or about July 22, 2003, patient P.A. consulted with respondent regarding a scar-revision technique that would improve several scars on her nose and chin.  P.A.

EXHIBIT _____ 1

47

– 5 4 –

1  contacted respondent after viewing information on the Epione website. P.A. was impressed with

2  the claims made by Epione, and the results evidenced by the before and after pictures displayed on

3  the website. During her consultation with respondent on July 22, 2003, P.A. made specific

4  reference to a photograph displayed on the website that depicted the before and after results of

5  scar revision techniques. One of the photographs of which P.A. inquired looked very much like a

6  before and after photograph she had seen in a brochure from another physician's clinic. When

7  P.A. asked respondent about this specific photograph on his website, respondent claimed that the

8  before and after photograph of the patient on the website was his patient, and that he had

9  performed the procedure.

10          97.     During the July 22, 2003, consultation, respondent told P.A. that his

11  Coolaser™ technique could produce the results seen in the photographs and there would be no

12  risk of scarring. Respondent drew P.A. a diagram of a skin cell and the skin layers, noting that the

13  Coolaser™ would produce far better results than either a $CO2$ or Erbium laser. P.A. advised

14  respondent that she only wanted the scars on her nose, and some indentations in her chin treated.

15  This initial consultation lasted approximately 30 minutes.

16          98.     On August 4, 2003, P.A. returned to respondent's office for a second

17  consultation. The only documentation in the medical record for this visit is a series of consents

18  that are signed and dated by P.A. During this consultation, respondent encouraged P.A. to have

19  her entire face treated with the Coolaser™, however, P.A. declined and told him she only wanted

20  her nose and chin treated. P.A. was provided materials from respondent's office listing what she

21  needed to do in preparation for the Coolaser™ treatment.

22          99.     On August 8, 2004, P.A. returned to respondent's office for her treatment.

23  The medical record indicates that P.A. signed another series of consent forms dated August 8,

24  2004.

25          100.    At the August 8, 2004 visit, P.A. was placed in a room by an assistant who

26  applied numbing cream to her nose and chin. When respondent came into the room, he appeared

27  rushed, picked up the laser, and was about to begin treatment when P.A. asked him if he was

28  going to take before and after photos of her face. Respondent took P.A.'s photograph and then

- 55 -

1   spent a few seconds using the laser on her chin and nose. After he finished, P.A. protested that he

2   had not given her the full treatment and respondent replied that she could not expect more from a

3   "freebie." For some reason, respondent did not think that P.A. had paid for this procedure, and

4   when he was advised to the contrary, he agreed to continue with treatment of her nose, chin, and

5   her left cheek. When P.A. told respondent that she only wanted her nose and chin done,

6   respondent told her that he would have to finish or her results would be uneven. There is no

7   documentation in the medical record of the procedure respondent performed on August 8, 2003.

8   There is no documentation in the medical record of the type of laser, the laser wavelength, or the

9   laser settings used in the treatment of P.A.

10        101.   After the treatment, P.A.'s face was blotched and oozing, and she contacted

11   respondent's office to complain. Respondent offered to see her again in the office, however, P.A.

12   declined because she was afraid to expose her raw skin to the sunlight.

13        102.   The consent forms that P.A. signed were very detailed and clearly stated

14   that there were no warrantees, no guarantees, and no promises with respect to results. The consent

15   forms also informed the patient of unforseen conditions and complications, and informed the

16   patient that scarring was rare. However, the Epione web page that P.A. accessed advertised that

17   the treatments were very safe, there was usually no recovery time, and that at Epione they proudly

18   stood behind the fantastic results of their treatments. The web page further advertised that Epione

19   delivered optimum results and that at Epione a "written satisfaction guarantee" was offered.

20   These guarantees and warrantees on the web page are inconsistent with the consent materials that

21   were given to P.A. by respondent's staff prior to her treatments.

22        103.   Respondent's care and treatment of P.A. constitute repeated negligent acts

23   as follows:

24        A.   Respondent's failure to perform and/or document an adequate history for

25   P.A. constitute a simple departure from the standard of practice.

26        B.   Respondent's failure to perform and/or document an adequate physical

27   examination of P.A. constitute a simple departure from the standard of practice.

28

1   49

1    C.    Respondent's failure to document in the medical record that he discussed

2  the risks, benefits, or any other treatment alternatives with P.A. constitutes a simple

3  departure from the standard of practice.

4    D.    Respondent's website guarantees a level of satisfaction for the patient and

5  guarantees results. The standard of practice does not allow the physician to provide any

6  guarantee of treatment success. Respondent's advertisements regarding guarantees

7  constitute a simple departure from the standard of practice.

8    E.    Respondent failed to consider and/or document that he discussed with P.A.

9  a more minimally invasive treatment to treat the scar on her nose. Respondent's acts

10  and/or omissions in this regard constitute a simple departure from the standard of practice.

11    F.    Respondent did not adequately follow P.A. postoperatively. Respondent's

12  acts and/or omissions in this regard constitute a simple departure from the standard of

13  practice.

14    G.    The medical record does not indicate what procedure was performed on

15  P.A., the laser wavelength, or laser used. Respondent's acts and/or omissions in this

16  regard constitute a simple departure from the standard of practice.

17    104.    Respondent's acts and/or omissions as set forth in paragraphs 96 through

18  103, inclusive, above, whether proven jointly, or in any combination thereof constitute repeated

19  negligent acts pursuant to section 2234(c) of the Code. Therefore, cause for discipline exists.

20                 **TWENTIETH CAUSE FOR DISCIPLINE**

21                            **(Patient P.A.)**

22                          **(Gross Negligence)**

23    105.    Respondent's acts and/or omissions in the care and treatment of P.A.

24  constitute gross negligence as follows:

25    106.    The allegations of the Nineteenth Cause of Discipline are incorporated

26  herein as if fully set forth.

27

28                                                      /        50

1        107.   Given the multitude of simple departures, respondent's overall care and

2    treatment of P.A. constitute gross negligence  pursuant to section 2234(b) of the Code.  Therefore,

3    cause for discipline exists.

### TWENTY-FIRST CAUSE FOR DISCIPLINE

**(Patient P.A.)**

**(Incompetence)**

7        108.   Respondent's acts and/or omissions in the care and treatment of P.A.

8    constitute incompetence as follows:

9        109.   The allegations of the Nineteenth and Twentieth Causes for Discipline are

10   incorporated herein as if fully set forth.

11       110.   Respondent's acts and/or omissions as set forth in paragraphs 109 above,

12   constitute incompetence pursuant to section 2234(d) of the Code.  Therefore, cause for discipline

13   exists.

### TWENTY-SECOND CAUSE FOR DISCIPLINE

**(Patient P.A.)**

**(Inadequate Records)**

17       111.   Respondent is subject to disciplinary action under section 2266 of the Code

18   in that respondent failed to maintain adequate records of his care and treatment of patient P.A.

19   The circumstances are as follows:

20       112.   The allegations of the Nineteenth and Twentieth Causes for Discipline are

21   incorporated herein by reference as if fully set forth.

22       113.   Respondent's acts and/or omissions as set forth in paragraph 112 above,

23   constitute the maintenance of inadequate records within the meaning of Code section 2266.

24   Therefore, cause for discipline exists.

25   //

26   //

27   //

28   //

## TWENTY-THIRD CAUSE FOR DISCIPLINE

### (Patient P.A.)

### (False or Misleading Advertising and/or Dishonest and Corrupt Acts)

114. Respondent is subject to disciplinary action under sections 2271, 17500 and 651 of the Code for false and/or misleading advertising, and/or dishonest and corrupt acts under 2234(e) of the Code as follows:

115. The allegations of the Nineteenth and Twentieth Causes for Discipline are incorporated herein as if fully set forth:

116. Respondent's website guarantees the patient's satisfaction with the treatment, and further advertises that a written satisfaction guarantee is offered at Epione. However, when P.A. presented for treatment at respondent's office, she was given consent forms to sign that were inconsistent with the guarantees advertised by respondent on his website. The consent forms stated that there were no warrantees, no guarantees, and no promises made with respect to the results from a treatment.

117. When P.A. inquired about the photograph of the patient that was exhibited on respondent's website during the initial consultation, respondent told her that the patient in the photograph was his patient, and that he had performed the procedure. In fact, the patient depicted on the website was not respondent's patient, and that patient's procedure had been performed by another physician.

118. Respondent's acts and/or omissions in paragraphs 115, 116, and 117 constitute false and/or misleading advertising in violation of sections 2271, 17500, and 651 of the Code, and/or dishonest or corrupt acts that are substantially related to the duties, functions, or qualifications of a physician in violation of section 2234(e) of the Code. Therefore, cause for discipline exists.

//
//
//
//

**TWENTY-FOURTH CAUSE FOR DISCIPLINE**

**(Patients S.O., C.H., S.B., S.J., and P.A.)**

**(Repeated Negligent Acts)**

119.     Respondent's acts and/or omissions with respect to his care and treatment of patients S.O., C.H., S.B., S.J., and P.A. constitute repeated negligent acts as follows:

120.     The allegations of the First, Second, Third, Sixth, Seventh, Ninth, Tenth, Eleventh, Thirteenth, Fifteenth, Sixteenth, Eighteenth, Nineteenth, Twentieth, and Twenty-Second Causes of Discipline are incorporated herein as if fully set forth.

121.     Respondent's acts and/or omissions set forth in paragraph 120 above, whether proven jointly, or in any combination, thereof constitute repeated negligent acts under section 2234 (c) of the Code.  Therefore, cause for discipline exists.

**TWENTY-FIFTH CAUSE FOR DISCIPLINE**

**(False or Misleading Advertising and/or Dishonest and Corrupt Acts)**

122.     Respondent is subject to disciplinary action under sections 2271, 17500 and 651 of the Code for false and/or misleading advertising, and/or dishonest and corrupt acts under section 2234(e) of the Code as follows:

123.     On or about November 2, 2004, an undercover operation was conducted by Medical Board Investigators at Epione, respondent's place of business.  Investigator Sylvia Salcedo posed as a patient seeking a consultation from respondent about brown spots on her face. When Investigator Salcedo signed in at the front desk, she was given a folder which contained paperwork for her to complete, and other informational materials for her to take home with her.

124.     Investigator Salcedo completed the paperwork and then returned the paperwork to the front desk.  While in the waiting room, Investigator Salcedo observed a woman waiting in the back of the office whose face, neck, and chest were very red.

125.     Investigator Salcedo was escorted into an examination room by an unidentified female wearing a blue uniform who advised her that someone would be seeing her shortly.  Approximately five minutes later, a woman wearing a white coat entered the room and identified herself as "Roxanna," a consultant. Roxanna looked at Investigator's Salcedo's chart

*1*     *53*

1 and asked what she wanted to have done. Investigator Salcedo advised her that she was most

2 concerned about brown spots on her face.

3      126.   Roxanna told Investigator Salcedo that the Coolaser™ treatment would

4 work for her brown spots and for the fine lines around her eyes. When Investigator Salcedo

5 inquired about a small indentation located in the area between her eyes, Roxanna recommended

6 the Coolaser™. When Investigator Salcedo inquired about the removal of the freckles on her

7 chest, Roxanna recommended the Coolaser™.

8      127.   Investigator Salcedo advised Roxanna that she was concerned about her

9 face burning after a laser treatment. Roxanna advised her that the first treatment would determine

10 if she could tolerate the procedure, and also how her skin reacted to the laser. Roxanna advised

11 Investigator Salcedo that the second and third treatments are more intense and will give the

12 appearance of being in the sun at the beach all day. Roxanna advised Investigator Salcedo that the

13 Coolaser™ treatment consisted of three treatments.

14      128.   Roxanna advised Investigator Salcedo that the downtime with the

15 Coolaser™ treatment was one to two days, and that their office would provide all of the creams

16 she would need.

17      129.   Investigator Salcedo asked Roxanna if a patient had ever had a bad reaction

18 to the treatment, Roxanna responded that only one patient had a bad reaction to the treatment and

19 that occurred because the patient had cold sores and had not informed the staff or respondent

20 about them.

21      130.   When Investigator Salcedo told Roxanna that she had seen people who

22 looked like burn victims after the treatment, Roxanna replied that those patients had received

23 more aggressive treatments.

24      131.   When Investigator Salcedo asked Roxanna about any side effects of the

25 Coolaser™, she was informed that her skin would be red for a day or two. When Investigator

26 Salcedo asked if she could speak to the physician to ask him some questions, Roxanna left the

27 room, returned five minutes later, and told Investigator Salcedo that respondent was performing a

28 procedure.

32

1       132.  Investigator Salcedo was shown more before and after photos of patients

2  who underwent the Coolaser™ treatment.  She then told Roxanna that she would think about

3  whether to have the procedure done and left the office.  Several weeks later, Investigator Salcedo

4  received a telephone call from "Vicky" of Epione who said she was following up on her visit.

5  When Investigator Salcedo told Vicky that she would be traveling, Vicky informed her that she

6  could put twenty percent down to hold a date since they were very busy and it could take months

7  to get in.

8       133.  Respondent's acts and/or omissions, and his employee's acts and/or

9  omissions, constitute false and/or misleading advertising, and/or dishonest and corrupt acts as

10 follows:

11      A.  Respondent's assistant, Roxanna, informed Investigator Salcedo that the

12 treatment with the Coolaser™ consisted of three treatments.  However, during the Medical

13 Board interview on March 17, 2005, respondent admitted that the Coolaser™ treatments

14 are only sold in a package of "up to three treatments" and that the second or third

15 treatment are only done if necessary.

16      B.  Respondent's assistant, Roxanna, informed Investigator Salcedo that they

17 only had one patient who experienced a bad reaction from the Coolaser™ treatment.  This

18 statement was false since patients S.O., C.H., S.B., S.J., and P.A. all complained of a bad

19 reaction to the Coolaser™ treatment to respondent and to respondent's staff.

20      C.  When Investigator Salcedo inquired about the Coolaser™ treatment

21 burning her face because she had seen other patients who looked like burn victims,

22 Roxanna again mislead her by stating that those patients received more aggressive

23 treatments when, in fact, that was not true since patient S.O. was treated for first and

24 second degree burns after her Coolaser™ treatment with respondent.

25      134.  Respondent's acts and/or omissions as set forth above constitute false

26 and/or misleading advertising under sections 2271, 651 and 17500 of the Code, and/or dishonest

27 and corrupt acts that are substantially related to the duties, functions, or qualifications of a

28 physician under section 2234(e) of the Code.  Therefore, cause for discipline exists.

1

## ADDITIONAL STATUTES

2      135.    Sections 2052, 2054, 2262, and 2264 of the Code provide as follows:

3      **2052** (a) Notwithstanding Section 146, any person who practices or

4  attempts to practice, or who advertises or holds himself or herself out as practicing, any system or

5  mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or

6  prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other

7  physical or mental condition of any person, without having at the time of so doing a valid,

8  unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to

9  perform the act pursuant to a certificate obtained in accordance with some other provision of law

10  is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by

11  imprisonment in the state prison, by imprisonment in a county jail not exceeding one year, or by

12  both the fine and either imprisonment.

13      (b) Any person who conspires with or aids or abets another to commit any

14  act described in subdivision (a) is guilty of a public offense, subject to the punishment described

15  in that subdivision.

16      (c) The remedy provided in this section shall not preclude any other remedy

17  provided by law.

18      **2054** (a) Any person who uses in any sign, business card, or letterhead, or,

19  in an advertisement, the words "doctor" or "physician," the letters or prefix "Dr.," the initials

20  "M.D.," or any other terms or letters indicating or implying that he or she is a physician and

21  surgeon, physician, surgeon, or practitioner under the terms of this or any other law, or that he or

22  she is entitled to practice hereunder, or who represents or holds himself or herself out as a

23  physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law,

24  without having at the time of so doing a valid, unrevoked, and unsuspended certificate as a

25  physician and surgeon under this chapter, is guilty of a misdemeanor.

26      (b) A holder of a valid, unrevoked, and unsuspended certificate to practice

27  podiatric medicine may use the phrases "doctor of podiatric medicine," "doctor of podiatry," and

28  "podiatric doctor," or the initials "D.P.M.," and shall not be in violation of subdivision (a).

_/_    _56_

1    2262. Altering or modifying the medical record of any person, with

2    fraudulent intent, or creating any false medical record, with fraudulent intent, constitutes

3    unprofessional conduct. In addition to any other disciplinary action, the Division of Medical

4    Quality or the California Board of Podiatric Medicine may impose a civil penalty of five hundred

5    dollars ($500) for a violation of this section.

6    2264. The employing, directly or indirectly, the aiding, or the abetting of

7    any unlicensed person or any suspended, revoked, or unlicensed practitioner to engage in the

8    practice of medicine or any other mode of treating the sick or afflicted which requires a license to

9    practice constitutes unprofessional conduct.

10   ## TWENTY-SIXTH CAUSES FOR DISCIPLINE

11   ### (Patient F.L.)

12   136.   Respondent is further subject to disciplinary action for unprofessional

13   conduct pursuant to the following Business and Professions Code sections: 2234 (general

14   unprofessional conduct) and/or 2234(b) (gross negligence); and/or 2234(c) (repeated negligent

15   acts) and/or 2234(d) (incompetence); and/or section 2234(e) (dishonesty or corruption); and/or

16   2261(false representations in documents); and/or 2262 (alteration of medical records); and/or

17   2264 (aiding and abetting unlicensed practice of medicine); and/or 2266 (inadequate records);

18   and/or 2234(a) in conjunction with 2052(a) and/or 2052(b) (aiding and abetting unlicensed

19   practice of medicine); and/or 2234(a) in conjunction with 2054(a) (aiding and abetting

20   misrepresentation as a physician). The facts and circumstances are as hereinafter set out.

21   137.   On or about February 9, 2006, the Medical Board of California received

22   information from Marc Ruiz, Special Agent, Federal Food and Drug Administration, Office of

23   Criminal Investigations, that Dr. Ourian may be aiding and abetting the unlicensed practice of

24   medicine. During an FDA investigation of Dr. Ourian's possible use of unapproved Botox type

25   products, it was revealed Dr. Ourian may have aided and abetted Daniel Serrano, a registered

26   nurse, in performing face lift surgeries at Dr. Ourian's office.

27

28                                                              1      57

- 64 -